No. 24-5988

# United States Court of Appeals
## for the Sixth Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.

ASHLEY GRAYSON,
*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Western District of Tennessee
No. 2:23-cr-20121 (McCalla, S.J. - Trial)
(Parker, J. - Sentencing)

---

SUPPLEMENTAL BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES

---


For the Appellee:

D. MICHAEL DUNAVANT
United States Attorney

BRYCE H. PHILLIPS
Assistant United States Attorney
167 North Main Street, Suite 800
Memphis, Tennessee 38103
(901) 544-4231
bryce.phillips@usdoj.gov

TABLE OF CONTENTS

Table of Authorities ..................... iii

Statement of the Case ..................... 1

Argument ..................... 2

I. The position of the Solicitor General ..................... 2

II. Any potential error in admitting the FaceTime recording was harmless in light of the overwhelming other evidence of Ashley's guilt. .......... 3

III. Ashley has not shown that the FaceTime recording violated Title III. ..................... 12

Conclusion ..................... 14

Certificate of Compliance ..................... 15

Designation of Relevant District Court Documents ..................... 16

Certificate of Service ..................... 17

## TABLE OF AUTHORITIES


Cases Page(s)

*Brown v. United States*, 411 U.S. 223 (1973) ........................................................11
*Kotteakos v. United States*, 328 U.S. 750 (1946) ....................................................4
*Traficant v. Commissioner*, 884 F.2d 258 (6th Cir. 1989) ......................................13
*United States v. Grayson*, 2025 WL 2366262 (6th Cir. Aug. 14, 2025) ...................1
*United States v. Grayson*, 146 S. Ct. 1872 (2026)...................................................11
*United States v. Murdock*, 63 F. 3d 1391 (6th Cir. 1995).........................................2
*United States v. Olano*, 507 U.S. 734 (1993) .........................................................11
*United States v. Vest*, 639 F. Supp. 899 (D. Mass. 1986).......................................13

Statutes Page(s)

18 U.S.C. § 1958 ..........................................................................................................1
18 U.S.C. § 2511 ........................................................................................................12
18 U.S.C. § 2511(2)(d)........................................................................................ 12, 13
18 U.S.C. § 2515 .................................................................................................... 3, 14

Rules Page(s)

Federal Rule of Criminal Procedure 52(a)...................................................................3

## STATEMENT OF THE CASE

Ashley Grayson hired Olivia Johnson and Brandon Thomas to kill three people. *United States v. Grayson*, No. 24-5988, 2025 WL 2366262, at *1 (6th Cir. Aug. 14, 2025), *cert. granted, judgment vacated,* 146 S. Ct. 1872 (2026). Unknown to Ashley, Johnson recorded a video call in which Ashley discussed the murders and turned those recordings over to the authorities. *Id.* Based on this evidence, Ashley and her husband Joshua Grayson were charged with conspiring to use interstate commerce facilities in the commission of murder-for-hire of Derricka Harwell, in violation of 18 U.S.C. § 1958. Indictment, R. 2, PageID 2.[1]

They proceeded to trial. A detailed account of the trial evidence appears in the government's principal brief, Gov't's Br., ECF No. 38, pp. 3-13, and in this Court's August 14, 2025, decision, *Grayson*, 2025 WL 2366262, at *1-3.

Following a jury trial, Ashley was convicted of conspiring to commit murder for hire. Min. Entry, R. 127. Joshua was acquitted. *Id.* The district court sentenced Ashley to 120 months of imprisonment, followed by three years of supervised release. Redacted Judgment, R. 211. This Court affirmed. *Grayson*, 2025 WL 2366262, at *9. Ashley filed an unsuccessful petition for rehearing en banc, Pet. for En Banc Reh'g, ECF No. 52, followed by a petition for certiorari before the Supreme

[1] Citations to the record (R.) are to the underlying criminal case, W.D. Tenn. 2:23-cr-20121.

Court, U.S. Supreme Court Notice, ECF No. 56. The Supreme Court granted the petition for a writ of certiorari, vacated this Court's judgment, and remanded the case for further consideration in light of the position asserted by the Solicitor General in his brief for the United States. U.S. Supreme Court Order, ECF No. 57. This Court has now directed the parties to submit supplemental briefs addressing the following questions: (1) How should the panel resolve the appeal in light of the position asserted by the Solicitor General in his brief before the Supreme Court?; and (2) Was any error confessed by the Solicitor General harmless?

## ARGUMENT

### I. The position of the Solicitor General

The Court has asked how the panel should resolve the appeal in light of the position asserted by the Solicitor General in his brief before the Supreme Court. The Court should affirm Ashley Grayson's conviction. As explained in the Solicitor General's brief in opposition to Ashley's certiorari petition, the government acknowledges that this Court's "clean-hands" exception, articulated in *United States v. Murdock*, 63 F.3d 1391 (6th Cir. 1995), is not supported by the text of Title III, 18 U.S.C. § 2515. But that incorrect reasoning does not affect the outcome here because (1) any potential error in admitting the FaceTime recording was harmless, and (2) Grayson has not shown that the recording violated Title III.[2]

[2] The government previously argued in its principal brief that the FaceTime

## II. Any potential error in admitting the FaceTime recording was harmless in light of the overwhelming other evidence of Ashley's guilt.

Even assuming that the recording should have been excluded, reversal is unwarranted here because any error was harmless under Federal Rule of Criminal Procedure 52(a). A nonconstitutional evidentiary error requires reversal only where it had a substantial and injurious effect on the verdict. *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946). Here, there was substantial uncontroverted evidence of Grayson's guilt other than the recording, including: (1) testimony of Johnson and Thomas; (2) text messages between Ashley and Johnson that documented the murder-for-hire scheme; (3) surveillance footage from Joshua Grayson's Dallas apartment; (4) Ashley's communications with Harwell, the intended victim; and (5) Ashley's own 23-minute call to the FBI.

*Testimony of Johnson and Thomas*

Johnson and Thomas—whom Ashley attempted to recruit as would-be murderers—both testified under oath at trial. Johnson testified that Ashley asked her and Thomas to fly to Dallas, with all expenses paid, to meet with her and Joshua. Trial Tr., R. 144, PageID 1212-13. Thomas, likewise, recalled that Ashley paid for him and Johnson to fly to Dallas to meet with her. Trial Tr., R. 145, PageID 1503-

---

recording was not an interception of an oral communication. *See* Gov't's Br., ECF No. 38, pp. 26-27. The government no longer advances that argument.

04. Like Johnson, Thomas did not at this point know Ashley's true purpose in arranging the meeting. *Id*.

Thomas and Johnson each testified that after landing in Dallas and checking into a hotel, they took an Uber to Ashley's home. *Id*. at PageID 1507; Trial Tr., R. 144, PageID 1219. A few minutes after they arrived, the pair were driven in separate vehicles to Joshua's Dallas apartment. *Id.* at PageID 1221-29. Ashley drove Johnson and Joshua drove Thomas. *Id*.; Trial Tr., R. 145, PageID 1506-10. Thomas testified that during his respective drive with Joshua, Joshua told Thomas about Patrick Tate, Ashley's ex-boyfriend, and described how he had previously driven past Tate's home but noticed the presence of doorbell cameras. Trial Tr., R. 145, PageID 1509-10.

Johnson testified that during her drive with Ashley, Ashley told Johnson that she wanted three individuals killed: Tate; Sherell Hodge, a TikTok content creator who had been causing significant trouble for Ashley online; and Harwell, a famous online personality also involved in the credit-repair business. Trial Tr., R. 144, PageID 1221-31. Johnson also testified that Ashley stated she had cash on hand to make a deposit for the murder. *Id.* at PageID 1230-31.

Johnson testified that after the group arrived at Joshua's Dallas apartment, Joshua told them that he had previously gone to Tate's home and noticed multiple doorbell cameras. He further stated that he had gone to Tate's North Carolina

townhome with the intention of killing him because Tate continually bothered and antagonized Ashley. Trial Tr., R. 145, PageID 1249-51.

Johnson testified that Ashley told her the locations of each of the three intended victims. *Id.* at PageID 1251. Johnson further stated that she and Thomas did not expressly refuse Ashley's murder-for-hire plot but played along; neither of them ever intended to kill any of the three individuals, despite Ashley's requests and her offers of large amounts of money. *Id.* at PageID 1252-56.

Thomas testified that once he and Johnson returned to Memphis, he recorded the FaceTime call between Ashley and Johnson during which Ashley offered thousands of dollars for Johnson and Thomas to kill Harwell, Hodge, and Tate. *Id.* at PageID 1512-16. Johnson confirmed this account, explaining that she used her cell phone to answer Ashley's FaceTime call while Thomas used his own phone to make a video of the call. *Id.* at PageID 1264-69.

*Text messages between Grayson and Johnson that documented the murder for hire scheme*

Johnson testified with the aid of a 106-page trial exhibit that memorialized text messages that Ashley and Johnson exchanged in 2021 and 2022. Trial Tr., R. 144, PageID 1187-88; Trial Ex. 5, R. 231-1, Extraction Report - Apple iPhone. Specific page numbers from that exhibit are referenced throughout her testimony.

Of note, on September 6, 2022, Johnson sent a text message to Ashley stating: "So how is this suppose[d] to go? We fuck with y'all but we don't wanna feel like

ducks. Can't be out here taking risks for nothing. Y'all got to feel us on that." *Id*. at PageID 1256. With that message, Johnson was attempting to get a deposit for the murder of Harwell. *Id*. at PageID 1257. Ashley responded, "Huh? FaceTime me." *Id.* Johnson and Ashley then messaged back and forth expressing displeasure with one another. *Id.* at PageID 1257-58.

On September 7, 2022, Ashley sent the following text message: "I don't have an attitude. You could have FaceTimed me instead of texting me. That was messy. What did you expect me to write and text you back? Did you want me to text you the whole business plan out? Seriously, think about what you did." *Id.* at PageID 1258.

On September 10, 2022, Johnson texted Ashley: "Hey, can y'all come down here? We need to talk in person." *Id.* at PageID 1263. Johnson wanted to discuss the house issue with Ashley. *Id.* Ashley declined, saying that she and Joshua were going to North Carolina and had been traveling too much. *Id.* Johnson asked Ashley to FaceTime her when she could. *Id.* at PageID 1264.

Following numerous texts and the September 10, 2022 FaceTime call that was entered as Trial Exhibit 5, Johnson and Thomas did not go to Mississippi that night to kill Harwell as Ashley intended. Instead, Johnson again contacted Ashley via FaceTime, showed her some police cars gathered with their emergency lights on at an unrelated crime scene in the area, and told her (falsely) that they shot up Harwell's

house. *Id*. at PageID 1273. Johnson asked Ashley for money for the fictional "attempted homicide," and Ashley agreed to pay her and Thomas $10,000. *Id.*

*Trip to Dallas, Texas where the Graysons paid Johnson and Thomas $10,000 in cash*

Ashley's text conversations with Johnson and the testimony of both Johnson and Thomas are all further corroborated by the security camera footage of Joshua's apartment building in Dallas from September 11, 2022, which was introduced as Trial Exhibit 1, in addition to the testimony of Johnson and Thomas regarding the transaction. After Johnson told Ashley that they shot up Harwell's house, Johnson and Thomas traveled to Dallas again. Trial Tr., R. 145, PageID 1274, 1518. This time they drove. *Id*. The pair met the Graysons in the lobby of Joshua's apartment building, where Joshua passed Thomas the previously agreed upon $10,000 in cash. *Id.* at PageID 1284-91. Johnson and Thomas then drove back to Memphis. *Id.* at PageID 1291-92.

*Emails, text messages, and social media posts regarding Ashley and Harwell*

The evidence introduced at trial included highly acrimonious communications between Ashley and Harwell. On the surface, Ashley's budding online friendship with Harwell started off positively, but the relationship soon turned vitriolic. Trial Tr., R. 147, PageID 1670-1701. Throughout Ashley's correspondence with Harwell, as well as Ashley's social media posts concerning Harwell, she became more and more upset at Harwell. Specifically, in one post made by Ashley on Facebook, she

stated that she believed Harwell created a fake social media profile under the name Andre Smith. *Id*. at PageID 1700. According to Ashley, this fake account that was operated by Harwell posted Ashley's address and made "over 30 posts about how [Ashley] was jealous of [Harwell]." *Id*.

The online relationship eventually deteriorated into hatred. Ashley appeared to take particular umbrage at Harwell blocking her on social media, prompting Ashley to send a message stating: "don't be a messy bitch on Facebook when you have my number. Stop being a coward." *Id*. at PageID 1673-74. Harwell likely angered Ashley further when, on August 27, 2021, Harwell responded to the message by stating: "Girl, fuck you. No one is jealous of you. I don't want your life. Hell, you don't even want your life. I pity your ass. Your own daddy would rather kill himself than be with you even with money and everyone else decided they could be bought." *Id*. at PageID 1674. Harwell also informed Ashley at that time that she was blocking Ashley's phone number as well. *Id*. at PageID 1675. At some point prior to September 2022, Ashley decided to plan the removal of someone she obviously considered an enemy. The messages and posts referenced above demonstrate Ashley's animus toward Harwell and underscore her motive for seeking Harwell's death.

*Ashley's recorded call to the FBI partially admitting to the contents of the FaceTime calls*

After Johnson and Thomas's second and final trip to Dallas, Johnson and Ashley's relationship deteriorated rapidly, as reflected in a series of text messages where they accused each other of being rude. Johnson insisted that Ashley remove her name from the deed to the house; Ashley accused Johnson of threatening her; Johnson revealed the existence of the FaceTime recording; and Ashley accused Johnson of extortion. Trial Tr., R. 145, PageID 1293-1318.

Johnson testified that Ashley told her that she had called the FBI about Johnson's "extortion" and sent her a voicemail that Ashley had received from an FBI agent in reference to Grayson's complaint. *Id.* at PageID 1318-19. FBI Special Agent Hosafros testified that during Ashley's 23-minute recorded call to the FBI, she stated that two people—a friend, Olivia Johnson, and her husband—were extorting her. *Id*. at PageID 1557-1564; Trial Ex. 24, FBI Call, 0:48 to 4:00; 5:29 to 5:34. Ashley said that people were bullying her online and that she had FaceTimed with her friend. Ashley told the FBI that she had been venting about what she wanted to happen to the people bullying her online. Trial Ex. 24, FBI Call at 1:06 to 2:00. She also explained that she purchased Johnson's mother a $300,000 home which she owned jointly with Johnson's mother, and she said that Johnson and Thomas were threatening to make it look like she wanted something done to her online bullies if she did not transfer the home fully to the mother. *Id.* at 1:06 to 3:42. Ashley called it an extortion scheme. *Id.* at 3:55 to 4:01.

In response to a question from the FBI agent on the phone about what was on the recorded FaceTime videos, Ashley stated:

> The videos were saying that um I would want the – the people who did this, like, *they deserved to die* because they, like, put my address out, they put my personal information on social media, they were inciting violence, *so I'm saying they deserved something to happen to them* since they're inciting violence on me. And then she proceeds to ask me, um, about like payments or something, like, you know would you be willing to pay, and *I'm like yeah I'd be willing to pay* like I don't even care, like they're bullying me, they have my personal address on social media, and then they just kept going and kept going like just asking me all of these weird questions, and I didn't think like about the other like I said I'm just venting.

*Id.* at 10:43 to 11:28; Order Denying Mot. for New Trial and for Acquittal, R. 174, PageID 2077 (emphasis added). Once Hosafros was assigned the case, she attempted to call Ashley and left a voicemail when no one answered the call. However, Ashley never returned Hosafros's phone call. Trial Tr., R. 145, PageID 1561-63.

An appellant must show that their substantial rights were affected by the alleged error, meaning they must demonstrate that the judicial proceeding would have turned out differently if not for the error. Given this body of unchallenged and highly persuasive evidence, the FaceTime recording itself was "merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." *See Brown v. United States*, 411 U.S. 223, 231 (1973). The jury would have reached the same conclusion without the FaceTime video; no reasonable probability

of a different outcome exists. *United States v. Olano*, 507 U.S. 725, 734-35 (1993). As Justice Alito stated in his dissent to the Supreme Court's grant of Ashley's petition for a writ of certiorari, "[e]ven setting aside the FaceTime recording, a mountain of properly admitted evidence proved the defendant's guilt." *United States v. Grayson*, 146 S. Ct. 1872, 1873 (2026) (Alito, J., dissenting).

The government anticipates that Ashley will argue that Joshua's acquittal demonstrates that the admission of the FaceTime call materially affected the jury's determination of her guilt. It did not. As discussed above, the evidence against Ashley included many text messages and other communications between her and Johnson to which Ashley's husband Joshua was not a party, including the initial conversation in which Ashley asked Johnson to murder three people. Trial Tr., R. 144, PageID 1222-23, 1229-31. Joshua was also not a party to Ashley's recorded call with the FBI, during which Ashley "emphasize[d] that she wanted those who were online bullying her to die, and that she was willing to pay." Order Denying Mot. for New Trial and For Acquittal, R. 174, PageID 2093. Because Joshua was uninvolved in many of the inculpatory communications in this case, his counsel argued that he was a "clueless husband" who was unaware of his wife's criminal plans. Trial Tr., R. 147, PageID 1805; *see also id.* at 1908-09 ("Did anybody in this entire trial . . . see one, one text message from that man right there?"). Given the difference in evidence against Ashley and her husband, no substantial likelihood

exists that, absent the admission of the FaceTime recording, the jury would have found petitioner not guilty.

**III. Ashley has not shown that the FaceTime recording violated Title III.**

For the reasons stated above, the Court should find that the admission of the FaceTime recording was harmless even if error, given the overwhelming properly admitted evidence establishing Ashley's guilt. But the government also points out that it is unclear that the FaceTime recording violated Title III so as to trigger § 2515. Title III generally prohibits intentional interception of wire communications, subject to exceptions. *See* 18 U.S.C. § 2511. One exception squarely applies here: a party may intercept a communication to which she is a party, unless she does so *for the purpose* of committing a criminal or tortious act. 18 U.S.C. 2511(2)(d). The statute requires that the criminal or tortious aim be "*the* purpose" of the interception, not merely one among many. Some courts interpreting this language have held that a violation occurs only when the unlawful purpose is the primary motivation or a determinative factor for the interception. *See United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993); *United States v. Vest*, 639 F. Supp. 899, 904 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987); *but see United States v. Phillips*, 564 F.2d 32, 34 (8th Cir. 1977) (denying suppression after finding that the "primary purpose" for making the recording was not unlawful); *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022) (holding that the purpose for the

interception must be "essential to the actual execution of an illegal wiretap . . . [and] directly facilitate the criminal conduct").

This Court has not yet addressed how § 2511(2)(d) applies when a recording is made for mixed motives. The district court assumed without deciding that Johnson violated Title III, but the record shows that Johnson had several non-criminal reasons for recording the FaceTime call, including: documenting that she and Thomas never intended to commit murder, Trial Tr., R. 145, PageID 1257, 1309-11; preserving evidence in case petitioner later tried to harm them, *id.* at PageID 1311-12; attempting to sell the video to TMZ or some other news outlet, *id.* at PageID 1304, 1465; potentially providing the recording to the FBI, *id.* at PageID 1311, 1461-64; and creating proof relevant to a civil dispute over Johnson's mother's housing, *id.* at PageID 1312-13.

As the moving party, Ashley Grayson bears the burden of proving that the recording was made for an improper purpose. *Traficant v. Commissioner*, 884 F.2d 258, 266 (6th Cir. 1989); *Vest*, 639 F. Supp. at 907-08 ("It is the prevailing rule of the case law interpreting § 2511(2)(d) that the defendant bears the burden of proving by a preponderance of the evidence [her] contention of illegitimate purpose in making the recording."). As discussed, the record supports multiple lawful motives, and no evidence shows that extortion was Johnson's singular or even her primary purpose, and there was no finding that it was a "dominant" purpose (even if the Court

were to adopt the law of the First and D.C. circuits). Indeed, recording a conversation to preserve evidence or protect oneself was expressly contemplated as legitimate under the Wiretap Act. *Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010) (quoting the legislative history of the Wiretap Act).

Because the recording stemmed from mixed motives—including several lawful ones—Ashley cannot meet her burden to show that the criminal purpose was *the purpose* for the interception.

CONCLUSION

For these reasons, this Court should affirm Ashley Grayson's conviction.

Respectfully submitted,

D. MICHAEL DUNAVANT
United States Attorney

/s/ Bryce H. Phillips
Assistant United States Attorney
167 North Main Street, Suite 800
Memphis, Tennessee 38103
(901) 544-4231
Bryce.phillips@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I certify that this supplemental brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 3,329 words of Times New Roman (14-point) proportional type, from the Statement of Case through the Conclusion. Microsoft Word is the word-processing software that I used to prepare this brief.

/s/ Bryce Phillips
Assistant United States Attorney

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Appellee, pursuant to Sixth Circuit Rules 28(c) & 30(b), hereby designates the following filings in the District Court's record as entries that are relevant to this appeal:

| **DESCRIPTION OF ENTRY** | **DATE** | **RECORD ENTRY #** | **PAGE ID #'s** |
|---|---|---|---|
| W.D. Tenn. 2:23-cr-20121 | | | |
| Minute Entry | 03/29/2024 | 127 | N/A |
| Trial Transcript | 05/07/2024 | 144 | 932-1239 |
| Trial Transcript | 05/07/2024 | 145 | 1240-1595 |
| Trial Transcript | 05/08/2024 | 147 | 1639-1865 |
| Order Denying Mtn. for New Trial and for Acquittal | 07/30/2024 | 174 | 2076-2134 |
| Redacted Judgment | 10/31/2024 | 214 | 2484-89 |

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Brief for Plaintiff-Appellee United States was served upon counsel for Defendant-Appellant by filing it with this Court's CM/ECF system on August 10, 2026.

/s/ Bryce H. Phillips
Assistant United States Attorney